ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY *v.*
HESTERLY.

Opinion delivered February 27, 1911.

1. MASTER AND SERVANT—FEDERAL EMPLOYER'S LIABILITY ACT—JURISDICTION OF STATE COURTS.—State courts are authorized to enforce the rights declared or created by the Federal Employers' Liability Act of April 22, 1908, since that act does not expressly or by necessary implication confer exclusive jurisdiction on the Federal courts. (Page 252.)

2. SAME—FEDERAL EMPLOYERS' LIABILITY ACT—PLEADING.—While it is not necessary to plead a Federal statute, yet allegations constituting a cause of action or defense thereunder must be made in order to have the benefit thereof. (Page 252.)

3.  SAME—CONSTRUCTION OF FEDERAL ACT.—The Federal Employers' Liability Act is limited in its application to railroad carriers while engaged in commerce between any of the States or Territories, and to any person suffering injury while he is employed by such carrier in such commerce, or to his or her personal representative. (Page 253.)

4.  SAME—FEDERAL ACT—EFFECT ON STATE LAWS.—The Federal Employers' Liability Act of April 22, 1908, creating a remedy in favor of one who is injured while employed by a carrier in interstate commerce, did not supersede or suspend the laws of the States relating to or incidentally affecting the same subject-matter, such as a law of a State providing for survival of a cause of action for the death of an employee killed by the employer's negligence. (Page 254.)

5.  DEATH—LIABILITY—LEX LOCI.—In actions of tort based on negligence resulting in death or personal injury, the right of recovery must be determined by the law of the State where the injury was inflicted. (Page 256.)

6.  SAME—OKLAHOMA STATUTES.—Under Snyder's Comp. Laws of Okla., § § 5493, 5495, the administrator of a railway employee killed by the wrongful act of the railway company is entitled to bring two actions, one under the State law for the pain and suffering and mental anguish of the deceased, and the other for the pecuniary loss sustained by his next of kin under either the Federal or the State law, or under both. (Page 256.)

7.  MASTER AND SERVANT—ASSUMED RISK—INSTRUCTION.—In an action for the death of a brakeman caused by his falling through a car having a hopper bottom, an instruction that if he knew of the defective condition of the hopper doors and appreciated the danger he cannot recover, but if the fastenings were known to him to be defective but he did not appreciate the danger therefrom, he did not assume the risk, was properly refused. (Page 257.)

8.  SAME—LATENT DEFECTS.—It was not error to instruct the jury that a servant is not required to search for latent defects in the appliances of the business in which he is employed, but that he has a right to rely upon the master to perform his duty in furnishing safe appliances. (Page 257.)

9.  APPEAL AND ERROR—EXCESSIVE DAMAGES—REMITTITUR.—Where plaintiff's intestate suffered great pain, after he was injured, and survived his injuries five hours, an award of $10,000 for his injuries will be affirmed upon remittitur of one-half of that sum. (Page 258.)

Appeal from Crawford Circuit Court; *Jeptha H. Evans,* Judge; affirmed with remittitur.

### STATEMENT BY THE COURT.

This suit was brought by the administrator of the estate of Wm. B. Hesterly, deceased, to recover damages for the benefit

of the estate and the next of kin on account of an injury to deceased which resulted in his death about five hours afterwards.

The complaint was in two paragraphs. It alleged that the defendant was operating a line of railroad as a common carrier of freight and passengers in the State of Oklahoma, and that deceased was a brakeman on defendant's said line in Oklahoma, and that while he was engaged at Wagoner assisting in switching certain cars onto a side track it was necessary for him to pass over them in order to set the brakes; that while doing so the bottom fell from a car on which he was walking, the deceased fell through, and four cars ran over his lower limbs, severing them from his body; that the injury was caused by the negligence of the defendant in moving a dump bottom coal car in the train at a time when it knew that the fastenings of the bottom were unsafe, likely to give way and dump the contents of the car upon the ground, and that the brakeman on the train in the discharge of their duties would be required to pass over the car and thus be subject to the hazard of injury if the bottom fell. That deceased was 22 years old, had an earning capacity of $100 per month, and left his father and mother as his next of kin; that he would probably have contributed to them during his life expectancy $25 per month. Damages in the sum of $5,000 are asked for their benefit.

The second paragraph sets out the same allegations as to the employment of deceased and his injury, and, in addition, that deceased was taken from under the cars and left lying on the ground without proper medical attention for a space of more than three hours; that during that time he suffered intense physical pain and mental distress as the result of his injuries; that such pain was continuous from the time that he fell through the car and was injured until about 5 o'clock the next morning, when he died. Damages on this account are asked for the benefit of the estate.

The answer denied all the material allegations of the complaint, and further alleged that if deceased was injured his injury resulted from his own negligence in failing to exercise proper care to protect himself against injury, and that a recovery was barred by his contributory negligence; and further that his injury

resulted from a risk which he assumed, and that on account of his assumption of risk no recovery could be had.

The testimony tended to show that deceased was rear brakeman on appellant's freight train, between Van Buren, Ark., and Coffeyville, Kans.; that he left Van Buren on the train about four or five o'clock in the afternoon of August 25, 1909, reaching Wagoner, Okla., about 12:15 or 12:20 at night; that some six or eight cars were to be set out there; that the engineer switching the cars stopped the train at the "passing track switch," letting the cars go down the passing track, having some to set on the Y and some to set on the rip tracks; that the switch on which the cars were to be placed was opened by the head brakeman on the train; that it was the deceased's duty to ride the cars in, and that he did ride them in, and they were expected to stop just in the clear of the train. The engine was stopped in the clear of the cars, and they passed it going two or three miles an hour; deceased was at the time on the top of a box car, near the engine. The cars went about fifteen car lengths further down the switch track than the engineer expected them to, and he called to the head brakeman who threw the switch, and he backed up the main track and started to head in on the passing track to catch the cars. As he went down on the passing track, the fireman said: "There lies the brakeman." The head brakeman was on the right hand side of the pilot, and gave the signal to stop, and the engine was stopped. The head brakeman, Hall, came back to the gangway and said: "There lies Billy; he is cut all to pieces." He was told to see if he could do anything for him, and he got a torch and went to him. When he got there deceased told him how he was hurt. He told him to look on the first iron coal car and find a door open. He said: "I fell through that."

The engine had moved eight or ten car lengths on the passing track when the fireman discovered deceased. The fireman and the brakeman Hall went together. When deceased saw witness (the engineer), he called him; he was then lying between the passing track and the rip track, his body just outside the rail toward the rip track, with one leg cut off and the other one mashed. He talked of his mother and father, some one by the name of Uncle Will, and about a young lady at Fort Smith to

whom he said he was engaged to be married, and left messages for them.

The injury occurred between 12:15 and 12:20. A doctor was telephoned for, but it was an hour or an hour and a half before he came. Deceased was conscious all the time and appeared to be in great pain, complained about his legs hurting him and wanted them to straighten them out. He was placed on a cushion out of the caboose in the first section of the freight train, and remained there from an hour and thirty minutes to an hour and forty-five minutes. It was something like two hours before they moved him. He was first moved to the waiting room at the depot and then into the caboose. That was between three and four o'clock in the morning. They started with him to Van Buren, and when they had got about forty-five miles he died, about 5:30 o'clock. One of the doctors was on the train with him, returning.

It was the duty of deceased to cut off the engine, let the cars loose, get on top of them, ride them in, apply the brakes and stop them. This he was doing. It was found after the injury that on the first three cars going north—a box car and two coal cars loaded with cinders—the brakes were set. The box car was the one next to the engine, and the brakes on it were set, as were the brakes on the two cinder cars next to it. The third cinder car was the one with the hopper door down, and the brakes on it were not set. The brake was at the far end of the car from the box car on which deceased rode in to the switch. An examination disclosed that one of the hopper doors on this cinder car had fallen down out of place, one end of the chain attached to the door and the other end loose from the iron that should have held it up. The door swung down and left an opening. One of the chains to the door that was down was entirely gone, and the other was attached to the door but its attachment to the shaft which held it in place was broken. The chain did not appear to be broken, but the bolt that was connected with it and goes through the edge of the door and fastens it was, and the car inspector that examined the car early the next morning could not tell how long it had been broken. No rope or wire was found attached to that door. The bolts on both doors were broken. One door was down, the other in place and fastened with a wire

instead of a bolt.   It was a Missouri Pacific car made of iron.
There are four hoppers in one of these cars, two in each end of it.
A center rib about a foot wide flush with the floor runs through
the whole length of the car, and the hoppers are at either end
across this rib from each other.   They are slightly below the
level of the floor, of which they form a part when closed, each
making a hollow place from eight inches to a foot deep, a kind
of pocket in the floor.   The hoppers are about four feet square,
and each has two doors that swing up from the bottom of the
car crosswise, and from the corner there is a chain that goes to
a shaft which runs across the body of the car.   The shaft is
wound from the outside with a wrench, and winding that shaft
draws the doors to a closed position when they are latched on
the inside with a ratchet.

The cars were loaded with cinders to within three or four
inches at the top, and were about four feet deep, and the fasten-
ings of the doors could not be observed or discovered while the
car was loaded.

No cinders were found where deceased fell, nor any that
were apparently spilled on the ties or track.   There were 36 cars
in the train when it left Van Buren; these four loaded with
cinders had come up from Argenta.   One of the brakemen, after
leaving Van Buren, at the third station out from Wagoner, where
the train had been sidetracked for another train to pass, sat
down on the main track opposite his train and observed the
running gear as it pulled out of the side track, and saw nothing
wrong—no drop bottoms out of place.   The car through which
deceased fell was the fourth car from the engine when in the
train, and 31 cars from the caboose.

One witness stated that he inspected this car after the injury,
about 1:30 o'clock; noticed the drop door open and cinders had
caved through, caved entirely out on one side, and left a space
on the other side.   Saw on the top of the cinders where it looked
like a man had stepped over and about the length of his foot had
caved in beyond the length of this circle where it had caved in.
The drop was not there.   There were no fastenings to the drop
door that was down.   Saw no wire or piece of rope about those
fastenings, and no chain.   The lever was there, but there was
nothing to show where the chain had been severed from the door.

It was gone.   Cinders had leaked out through this hopper door, and about two feet on the other side, just the same as if the car was loaded, only it had caved in on one side; a funnel shape right over the hopper door; on the opposite side they were still there.   There was no running board over the top of the car, and in going over the car it was necessary for the brakeman to walk on top of the cinders which were about the color of the car.   These cars are in frequent use.   The brake staff on this class of cars is always on the end and near the center.

Hall, the head brakeman, opened the switch when Hesterly cut the cars off, and rode them in on the side track.   They headed in afterward with the engine to catch the cars and got a little way in on the passing track, and he saw Hesterly rise up and give a stop signal.   He was lying between the passing track and the rip track.   That was probably twelve or fourteen cars, something like that, from the track through which the cars headed in.   He was five or six cars from Hesterly when he first saw him.   The engine headed in, and the headlight disclosed his presence.   He called to the engineer, and they went to deceased.

This witness did not examine the car at Van Buren, but noticed it on the way to Wagoner.   This was at the Frisco crossing at Van Buren.   He dropped off at the crossing, and when he got back on the train and went over this car to the engine, he noticed that the cinders were all out around the pocket   The trap door was closed; it had been wired up.   He noticed the chain wrapped up over the rod that goes through there, and there is a wrench on the outside that screws them up, and the wire was wrapped around the chain.   The cinders had wasted out, and this door was fastened up as described.   The cinders were about a foot deep over the other door, the north door the way the train was going.

Witness next noticed this door at Fort Gibson, about 12 miles from Wagoner.   The cinders were then about like they were when he first noticed them.   Hesterly was the rear brakeman, and Hall told him about this car at Hanson.   He was at that time getting the number of a car to set out at Fort Gibson.   He thinks Hesterly was about the fifth car from the engine when he told him.   The crippled car was the fourth car from the engine.   When he told Hesterly about the car, he had a list, and

was telling the witness they had to drop them in at Wagoner, the four cinder cars. Witness did not examine the cinder car at Wagoner nor report to the conductor. He passed over this car four times; does not remember Hesterly passing over it except once, between Wagoner and Rex. Saw Hesterly, after they had dropped the cars on the passing track, on the head car with his lantern burning. Witness and Hesterly were standing by the fifth car from the engine when he told Hesterly about the car. He told Hesterly that the cinders were out from around the pocket, and he noticed the door was wired. Told him how the cinders were in the car and how they sloped back each way. Hesterly did not go on the car then. He just looked at the car. This witness also stated it was not necessary to set the brakes on the front car, which the proof shows Hesterly was attempting to do when injured by the defective fastening of the trap door giving way and dropping him through on to the track, but the undisputed facts are that the cars moved many car lengths further than the engineer and head brakeman thought they should with the brakes all set on the first three cars.

The car inspector at Argenta where the car was loaded made an outside inspection; did not inspect the shafts that held the door up and could not see the chains and fastenings on account of the load. The one at Van Buren said the doors were in place, that he did not examine the fastenings, that it was impossible to do that with a loaded car.

Deceased's father was shown to be 67 years old with an expectancy of ten years and his mother 60 with fourteen years' expectancy; the earning capacity of deceased was about $100 per month, his expectancy of life forty years, and his contributions to the family were anywhere from $15 to $40 per month. Deceased had been in the railroad service about five years, and he was familiar with Rule 401, which is as follows:

"Trainmen must examine and know for themselves that the brakeshafts, attachments, ladders, running boards, steps, handholds and other mechanical appliances which they are required to use are in proper condition; if not, report them to the proper authority that they may be put in order before using." All brakemen receive a copy of the book of rules, containing this among others.

The court, among others, gave the following instructions which were excepted to:

"VIII.    If Hesterly knew of the defective condition of the hopper door fastenings in question, if such fastenings were in fact defective, and appreciated the danger to himself therefrom in passing over said car, and with such knowledge and appreciation of danger passed over the hopper or attempted to do so, and fell through and was injured, he by such conduct assumed the risk himself, and plaintiff cannot recover.    But, if the fastenings were defective and unsafe, and Hesterly knew this, but did not appreciate the danger to himself therefrom in passing over the car, and passed over the hopper or attempted to do so, and fell through, and was injured, he did not assume the risk.

"IX.    A servant is not required to inspect the appliances of the business in which he is employed, to see whether or not there are latent defects that render their use more than ordinarily hazardous, but is only required to take notice of such defects or hazards as are obvious to the senses.    The fact that he might have known of defects, or that he had the means and opportunity of knowing them, will not preclude him from a recovery unless he did in fact know them, or in the exercise of ordinary care ought to have known them.    He is not bound to make an examination to find the defects.    There is no such legal obligation imposed upon him.    That is the duty of the master.    The servant is not bound to search for dangers, except those risks that are patent to ordinary observation.    He has a right to rely upon the judgment and discretion of his master, and that he will fully perform his duty toward him."

The jury returned a verdict on the first count of the complaint for the benefit of the next of kin in the sum of $2,000, and for the estate the sum of $10,000 on the second count.    Judgment was rendered accordingly, and defendant prosecutes this appeal.

*W. E. Hemingway,* for appellant.

The employers' liability act, passed by Congress April 22, 1908, does not authorize a recovery for pain and suffering, and the trial court erred in permitting appellee to recover on the second count of the complaint.    While it was competent for the Legislature of Arkansas or of Oklahoma to enact laws fixing a

liability, and providing a remedy, for injuries received by an employee in conducting interstate commerce, it was primarily a matter within the power of Congress; and when Congress legislated with respect to it, the acts of the Legislature were suspended and were no longer of any effect. Under the ruling in *Covington Bridge Co.* v. *Ky.,* 154 U. S. 204-209, the most that can be claimed by appellee in this case is that the State statutes were valid as falling within the second class enumerated in that case; and, this being true, they are valid only in the *absence of legislation by Congress.* See also 93 U. S. 99-104; 128 U. S. 96-99; 158 U. S. 98-105. The power to regulate the relation between employer and employee engaged in interstate commerce was conferred on Congress by the Constitution. 207 U. S. 463, 494, 540, 541; 167 Fed. 660; 175 Fed. 307; 67 S. E. 20; 124 S. W. 984; 111 S. W. 500; 117 N. W. 686. As evidence that both the statutes of Oklahoma and the employers' liability act regulate the same subject-matter, compare Snyder's Comp. Laws of Oklahoma, § § 5943 to 5946, inclusive, with the liability act, approved April 22, 1908.

2. The verdict on the first count for the benefit of the next of kin was excessive. It appears from the testimony of the father, who was the only witness on the question of contributions, that the contributions made by deceased were to his mother and sister during the time he took his meals and lodged at his father's home and was not required to pay board; that he was engaged to be married, but had postponed marriage because of his financial condition; that he had saved no money because work had been so dull he could hardly make expenses. The witness' memory as to when deceased was at home, when he left, when he last made contribution, when he was employed at profitable wages and when not employed, is too vague and indefinite to call for a verdict of $2,000, especially in view of the fact that the evidence does not warrant an inference that the contributions could reasonably be expected to continue.

3. If any verdict at all for pain and suffering was proper, a verdict of $10,000 was excessive. 57 Ark. 386; 42 N. W. 237; 178 Fed. 749.

4. The court erred in its charge on the question of assumed risk. Deceased was informed only a short time before the acci-

dent of the condition of the car, and under the rules of appellant it was his duty to inspect the defective part and, if necessary, report it. He assumed the risk of being injured by continuing to use the car as it was.

5. The ninth instruction is erroneous. Deceased's attention had been called to the defect. It was his duty, in the exercise of ordinary prudence, to make an inspection.

*Hill, Brizzolara & Fitzhugh,* for appellee.

1. Appellant itself ignored the employers' liability act in the lower court by availing itself of defenses authorized by the State law which were eliminated by said act. Having suffered defeat there on issues tendered by it, it will not be permitted to avail itself of a different theory of defense in this court. The Oklahoma statutes cited by appellant were statutes of the Territory prior to statehood, and were continued as statutes of the State, subject to such changes as the Constitution worked upon them. As bearing upon this question, see art. 9, § 36, art. 23, § § 6 and 7, Const. Oklahoma. Sec. 5943, Snyder's Code, is in effect the same as § 6285, Kirby's Digest, in providing for a survival of actions for injuries to person, and that action may be brought notwithstanding the death of the party injured, or liable for same. Likewise, § 5945 of the former Code, corresponds with § § 6289 and 6290 of Kirby's Digest, in creating a cause of action in favor the widow and children or next of kin.

In the absence of a decision by the Oklahoma Supreme Court to the contrary, this court will give to those statutes the construction placed on our similar statutes in the case of *Davis* v. *Railway,* 53 Ark. 117. It is unimportant just what construction will be placed on that section of the Oklahoma Constitution making the defense of contributory negligence and assumed risk always a jury question; it is enough that they are recognized as defenses under the Oklahoma law. Under the liability act, § 3, contributory negligence is not a bar to recovery in this class of cases, but serves only to diminish the damages in proportion to the amount of the employee's negligence contributing to the injury.

In section 4 of said act it is provided that the defense of assumed risk shall apply where there was a violation by the carrier of any statute enacted for the safety of the employee. Appellant's answer does not allege that deceased was injured while

appellant was engaged in interstate business, but instead pleads contributory negligence and assumed risk. The testimony it introduced, and the instructions it requested, were in support of and based upon this theory. There was no instruction asked nor ruling invited on the proposition that the Federal Employers' Liability Act applied. Its fourth instruction to the effect that plaintiff is not entitled to recover on account of deceased's physical or mental suffering was too general to raise the point. 101 Ind. 416; 17 Misc. Rep. (N. Y.), 138. See further on the question that the case should not be heard here on a different theory from that on which it was tried below: 58 Pac. 509; 44 N. Y. 415; 51 N. Y. 78; 162 N. Y. 42; 193 Mo. 286; 51 Ark. 441; 64 Ark. 253; 2 Cyc. 671; *Id.* 670, and notes 90 and 91.

2. If the complaint and answer in this case had made such allegations as would bring it within the Federal Employers' Liability Act, and if the evidence had sustained those allegations, there would be no jurisdictional reasons why the State court should not enforce the statutory liability given by the Federal act where applicable. In suits brought in one jurisdiction upon the statute of another, the court enforces the statute according to the *lex loci,* but applies its own law so far as the remedies are concerned. 154 U. S. 958. Hesterly would have had a right of action for pain and suffering, had he lived. The question then is whether the general statute of survivorship of personal actions would be applied as a part of the *lex fori.* The Davis case, 53 Ark. 117, is decisive of the point that the survivorship statute would be read into and made a part of the Federal statute.

3. The evidence justifies an estimate of an average monthly contribution by deceased to his parents of $25. This, taken in connection with the evidence as to his age, and that of his father and mother, and his earnings, without allowing for increase of earnings, warranted the verdict in favor of the next of kin.

4. How can this court say that the verdict for pain and suffering was excessive? Citation of individual cases is of no value.

"In actions for personal injuries * * * where there is no fixed rule of compensation * * * the decision of the jury is conclusive, unless they have been misled or their verdict has been influenced by corruption, passion or prejudice. Unless the verdict * * *

finds an amount of damages so out of proportion to the actual injury as to evince such misleading, or the presence of some malign influence, it will be sustained, although it may materially differ from the judgment of the court." 3 Sutherland on Damages (3 ed.), § 953.

*W. E. Hemingway,* for appellant in reply.

There is nothing to show that the defense that no recovery could be had for pain and suffering because of the Federal Employers' Liability Act was not interposed in the court below. Moreover, this objection was included in the proposition embodied in the fourth instruction asked by appellant to the effect that plaintiff was not entitled to recover damages on account of physical or mental suffering on count 2 of the complaint. It is not necessary to plead laws, but facts only; neither is it necessary to prove laws, since the court knows them. 116 Fed. 867; 94 Ark. 394; 91 Ark. 97.

KIRBY, J., (after stating the facts). It is contended that this case is controlled by the Federal Employers' Liability Act of April 22, 1908, which, it is claimed, does not permit a recovery for pain and suffering for deceased's estate. No mention is made in this statute of the jurisdiction of courts to enforce the rights declared or created by it, and it is well settled that State courts may exercise concurrent jurisdiction with the Federal courts in all cases arising under the Constitution, laws and treaties of the United States unless exclusive jurisdiction has been conferred expressly or by necessary implication on the Federal courts. *Claflin* v. *Houseman,* 93 U. S. 130, 23 L. Ed. 833; *Defiance Water Co.* v. *Defiance,* 191 U. S. 194, 48 L. Ed. 144; 11 Cyc. 996; *Raisler* v. *Oliver,* 97 Ala. 714, 12 South. 238; *Wilcox* v. *Luco,* 118 Cal. 642, 45 Pac. 676, 50 Pac. 758, 45 L. R. A. 582; *Schuyler National Bank* v. *Bolling,* 24 Neb. 825, 40 N. W. 414; *Bletz* v. *Columbia Nat. Bank,* 87 Pa. 92; *People* v. *Welch,* 141 N. Y. 273, 36 N. E. 328, 24 L. R. A. 117; *Bradbury* v. *Chicago, R. I. & P. Ry. Co.,* 128 N. W. (Iowa), 1.

It is true, as appellant says, that it is not necessary to plead a Federal statute, but allegations constituting a cause of action or defense thereunder must be made in order to have the benefit thereof. *Bradbury* v. *Choctaw, R. I. & P. Ry. Co.,* 128 N. W.

(Iowa) 1; *Smith* v. *Detroit & T. S. L. Co.,* 175 Fed. 506; *Defiance Water Co.* v. *Defiance,* 191 U. S. 194, 48 L. Ed. 143.

The complaint alleges "that the defendant, St. Louis, Iron Mountain & Southern Railway Company, is, and was on the date hereinafter mentioned, a railroad corporation operating a line of railroad in the State of Oklahoma, and was in said State of Oklahoma a common carrier of freight and passengers for hire." There was no allegation that the carrier was engaging in interstate commerce, nor that deceased was injured while employed by such carrier in such commerce, and, for aught that appears to the contrary in the pleadings, the negligence and injury was purely local to the State of Oklahoma, and the action an ordinary one at common law. Appellant pleaded contributory negligence and assumption of risk, as it could do under the laws of that State, in bar of appellee's right to recover. It is unquestionably true that the suit was not brought under nor based upon said act.

It is also true, however, that it developed in the testimony that the run of the train on which deceased was injured was from Van Buren, Ark., to Coffeyville, Kansas, and it was not disclosed whether it engaged in or hauled intrastate commerce on the trip. Appellant asked a peremptory instruction that plaintiff was not entitled in any event to recover on the second count of the complaint for the pain and suffering of deceased for the benefit of his estate. This being sufficient to raise the question under said Federal Employers' Liability Act, what is the effect of it? See Act of Congress approved April 22, 1908, c. 149, 35 Stat. 65, U. S. Comp. Stat. Supp. 1909, p. 1171.

This statute is limited to interstate commerce, to railroad carriers "while engaging in commerce between any of the States or Territories," and to "any person suffering injury while he is employed by such carrier in such commerce," or his or her personal representative, for it was without the power of Congress to enact it otherwise. *Howard* v. *Illinois Cent. Rd. Co.,* 207 U. S. 463.

Congress has plenary and exclusive power to regulate commerce between the States, and each State has like power to regulate commerce purely intrastate, and it is most difficult to separate such commerce, has not been attempted and can not be done except at a cost and inconvenience entirely disproportionate to

and beyond any possible benefit likely to accrue from such sep-
aration, for rarely does a train proceed that does not engage in
commerce both interstate and intrastate before its destination is
reached.

It is insisted that this law supersedes and suspends the opera-
tion of all State laws relating to or incidentally affecting the sub-
ject, and particularly that the remedy for the right declared or
created by it is exclusive.

In *Covington & Cinn. Bridge Company* v. *Kentucky,* 154 U.
S. 204, 209, the court said: "The adjudications of this court with
respect to the power of the State over the general subject of com-
merce are divisible into three classes. First, those in which the
power of the State is exclusive; second, those in which the States
may act in the absence of legislation by Congress; third, those in
which the action of Congress is exclusive and the States cannot
interfere at all."

In *Sherlock* v. *Alling,* 93 U. S. 99, 104, that court said:
"And it may be said, generally, that the legislation of a State, not
directed against commerce or any of its regulations, but relating
to the rights, duties and liabilities of citizens, and only indirectly
and remotely affecting the operations of commerce, is of obliga-
tory force upon citizens within its territorial jurisdiction, whether
on land or water, or engaged in commerce, foreign or interstate,
or in any other pursuit."

In *Smith* v. *Alabama,* 124 U. S. 465, 31 L. Ed. 508, the court
quoted in the opinion the above language of the Alling case, and
held valid a statute of Alabama prescribing the qualifications for
locomotive engineers, saying: "The power might with equal
authority be exercised in prescribing the qualifications for locomo-
tive engineers employed by railroad companies engaged in the
transportation of passengers and goods among the States, and in
that case would supersede any conflicting provisions on the same
subject made by local authority. But the provisions on the sub-
ject contained in the statute of Alabama under consideration are
not regulations of interstate commerce. * * * Considered in them-
selves, they are parts of that body of the local law, which, as we
have already seen, properly govern the relation between carriers
of passengers and merchandise and the public who employ them,
which are not displaced until they come in conflict with express

enactments of Congress in the exercise of its power over commerce, and which, until so displaced, according to the evident intention of Congress, remain as the law governing carriers in the discharge of their obligations, whether engaged in the purely internal commerce of the State, or in commerce among the States."

From these authorities it appears that the State may act within the doctrine of the second class of cases designated in *Covington & Cinn. Bridge Co.* v. *Kentucky, supra,* in the absence of controlling and exclusive legislation by Congress. Of course, if a State statute covers matters within the powers of Congress and necessarily conflicting with a statute enacted by Congress, it will be superseded by and must give way to the Federal statute. But it must be remembered that this statute of the State which it is claimed is superseded by the Federal Employers' Liability Act is not one regulating nor attempting to regulate the relations of employers and employees engaged in interstate commerce by railroads, is not directed against commerce or any of its regulations, and relates only to the rights, duties and liabilities of persons, and can but indirectly and remotely affect the operations of commerce, if at all.

It is a general statute providing that a cause of action for an injury to the person, which was also a cause of action at the common law, shall survive and not perish with the death of the person injured, as it did at the common law. It did not create a right, but only preserved to the injured person's estate one that otherwise would have ceased to exist at his death. *Davis* v. *Railway,* 53 Ark. 117.

From the terms of the Federal statute no intention is disclosed to limit or take from employees any right theretofore existing by which they were entitled to a more extended remedy than that conferred upon them by the act, and it was evidently the purpose of Congress in passing it to extend further protection and enlarge the remedy provided by law to employees engaged in interstate commerce in case of death or injury to them while engaged in such service. It may be that this statute does not give a right of action for the injury to the person that survives his death, as some courts have held, but it is not in conflict with the State law giving or preserving such right, which we hold is

not superseded by it, and that the remedy it provides is not exclusive of that under the State law permitting a recovery upon said surviving right of action.

We are not unaware of the decision in *Fulgham* v. *Midland Valley R. Co.,* 167 Fed. 660, nor of other decisions of some of the State courts taking a contrary view of the law nor of its amendment by Congress since the occurrence of this injury.

2. As between the States of Arkansas and Oklahoma, the testimony shows that the injury occurred within the State of Oklahoma, and its laws would govern, the rule being that in actions of tort based on negligence resulting in death or personal injury the right of recovery must be determined by the law of the State where the injury was inflicted. *St. Louis, I. M. & S. Ry. Co.* v. *Brown,* 67 Ark. 295; *Northern Pac. R. Co.* v. *Babcock,* 154 U. S. 190, 38 L. Ed. 958; *Slater* v. *Mex. Nat. R. Co.,* 194 U. S. 120, 48 L. Ed. 900; 26 Cyc. 1079.

The cause of action which accrued to the injured party by the common law survived after his death to his administrator under section 5493, Snyder's Comp. Laws of Oklahoma, 1909. By section 5945, *Id.,* a right of action is created in favor of the personal representative for the death of one caused by a wrongful act, the recovery to inure to the exclusive benefit of the widow or next of kin, as is also provided by said Federal Employers' Liability Act relative to one employed in interstate commerce.

By sec. 36, art. 9, of the Constitution of Oklahoma, the common-law doctrine of fellow servant is abrogated as to employees of railroad companies, and an injured employee is given a right to recover for every injury suffered by him; "and when death, whether instantaneous or not, results to such employee from any injury for which he could have recovered, * * * had not death occurred, then his legal or personal representative, surviving consort or relative, * * * shall have the same rights and remedies with respect thereto as if death had been caused by the negligence of the master."

Sec. 7, art. 23, of its Constitution, provides: "The right of action to recover damages for injuries resulting in death shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation."

We are not able to ascertain that the courts of that jurisdic-

tion have construed these provisions of the law, but they are the same in effect as the laws of this State upon the subject. Secs. 6285, 6289 and 6290 of Kirby's Digest of the Statutes of Arkansas.

Our laws have been construed in a well considered and able opinion by Judge COCKRILL in *Davis* v. *Railway*, 53 Ark. 117, holding that deceased's cause of action in his lifetime survives, and the right given by this other statute, modeled after Lord Campbell's Act, results from and accrues on the death of the injured party, and that both actions may be prosecuted in the name of the personal representative. "One is for the loss sustained by the estate and for the suffering from the personal injury in the lifetime of the decedent; * * * the other takes no account of the wrongs done to the decedent, but is for the pecuniary loss to the next of kin occasioned by the death alone. The death is the end of the period of recovery in one case, and the beginning in the other. In one case the administrator sues as legal representative of the estate for what belonged to the deceased; in the other he acts as trustee for those upon whom the act confers the right of recovery for the pecuniary loss inflicted upon them."

We hold this also a reasonable and fair construction of the laws of that State, and that appellee herein was entitled to recover damages for the pain and suffering and mental anguish of the deceased thereunder, and for the pecuniary loss sustained by his next of kin by reason of his wrongful death under either or both the Federal and State law.

3. We do not think error was committed in the giving of instruction No. 8, which fairly submitted to the jury the question of assumption of risk by deceased. The testimony did tend to show that he had been advised that one of the doors on this car appeared to be wired up, that some of the cinders had fallen through from over it; but it was not this door through which deceased fell, and the most danger that could have been anticipated from its condition was the unevenness of the cinders by reason of the depression over this door, across which he could step, which might have caused him to fall within the car on the cinders in the performance of his duty, and nothing more.

Instruction No. 9, objected to, was not an incorrect statement of the law in this case, for under rule No. 401 read in evi-

dence, and with which deceased was shown to be familiar, it was his duty to make inspection only of certain appliances—brake beams, running boards, etc., apparatus with which he came in contact by his service—and report defects therein. It was shown that the only inspections made of this trap door, which fastened on the inside, by persons whose duty it was to inspect the cars—the car inspectors—were outside inspections, while a load of cinders four feet deep was upon the door and prevented any possibility of discovery by the inspectors of the insecure and defective fastenings thereof; and the jury might well have found negligence on the part of the company in the failure of this primary duty to the deceased.

It is next contended that the damages allowed for pain and suffering and mental anguish are excessive. Deceased's legs were both mashed off through the knees, and no physician ministered to him for an hour and a half thereafter, and he lived for five hours suffering great pain—at least before the arrival of the physician—and the testimony shows that he suffered great anguish of mind about approaching death, and continually begged those present to pray for him.

In *Railway Co.* v. *Robbins,* 57 Ark. 386, the deceased's leg was mangled and his system subjected to a terrible shock, which he survived for twenty-four hours, under intense pain and in the anguish of impending dissolution, and the court, "without intimating that we would have awarded a sum so large," refused to disturb a verdict for $2,500.

But in *St. Louis, I. M. & S. Ry. Co.* v. *Waren,* 65 Ark. 610, it was said: "Courts and juries must deal with these questions in a deliberate and practical manner."

In *Aluminum Co.* v. *Ramsey,* 89 Ark. 522, the plaintiff, 22 years old, was injured in his leg, which had to be amputated below the hip. He was in the hospital ten weeks, suffering great pain; he was disfigured and incapacitated to make a living; and the court reduced the judgment to $12,000.

The court concludes in the case at bar that the verdict upon the second count of the complaint is excessive, and that a remittitur of $5,000 should be entered.

Personally, I do not agree to this. Though the suffering of pain and anguish—the pain of a lifetime and the anguish of mind

at approaching death—was compressed, it is true, into five hours of time when death relieved the sufferer, yet the jury were as capable of judging matters of this kind as this court can be, and they have fixed the damages at $10,000; and under the Constitution of Oklahoma verdicts are not to be limited in amount in actions for damages resulting from wrongful death; and I do not agree to the reduction.

If a remittitur of $5,000 is entered within fifteen days from this date, the judgment herein will be affirmed; otherwise the cause will be reversed and remanded for a new trial.

Mr. Justice WOOD dissents from that part of the opinion holding that the remedy provided by the Federal statute is not exclusive.