Missouri Pacific Railroad Company, Thompson, Trustee, *v.* Reed.

4-6845                                                   165 S. W. 2d 364

Opinion delivered October 26, 1942.

*Thos. B. Pryor, Thos. B. Pryor, Jr.,* and *Thomas Harper,* for appellant.

*R. E. Hough, Wall & Green* and *Partain & Agee,* for appellee.

GREENHAW, J. Appellee brought this action against the trustee in bankruptcy of the Missouri Pacific Railroad Company and H. C. Crawley and Earl Holloway, the engineer and fireman respectively in charge of the engine of a freight train, to recover damages for personal injuries he alleges he sustained about 1:30 p. m. March 29, 1941, as a result of a collision between the automobile he was driving and said freight train at the Missouri Pacific crossing on Main street in the town of Muldrow, Oklahoma.

Appellee, among other things, alleged that he was a citizen and resident of the state of Oklahoma, and was driving his automobile in a southerly direction, and that in approaching the crossing his view of a train approaching from the west was obstructed on account of a building and obstacles along the track; that defendants, Crawley and Holloway, in approaching the crossing operated their train at a negligent rate of speed through the town of Muldrow and negligently failed to ring a bell or sound a whistle or give any signal or warning of the approach of the train, and that they negligently failed to exercise ordinary and reasonable care to maintain a lookout for persons or property as the train approached the crossing; that after discovering plaintiff upon or approaching the crossing they negligently failed to exercise ordinary care to avoid striking the automobile or warn plaintiff.

Appellants filed an answer denying the allegations of the complaint, and further stated that if plaintiff was injured as alleged, such injuries were a result of his own contributory negligence in failing to exercise ordinary care for his own safety, failing to keep a lookout, failing to stop, look and listen at a railroad crossing although he knew or in the exercise of ordinary care should have known of the approach of the train, and that he carelessly and negligently drove his automobile onto the track in front of the train, and further pleaded that plaintiff's injuries were caused proximately and directly by his own negligence and want of care.

The jury returned a verdict in favor of appellee for $15,000, upon which judgment was entered and from which is this appeal.

Appellants contend that the court erred in refusing to direct a verdict for them for the reason that the undisputed evidence shows that appellee's own negligence was the proximate cause of his injuries, and even if there was evidence of negligence on the part of appellants, the undisputed evidence shows that appellee was guilty of contributory negligence as a matter of law, thus barring his right to recover, and that there was no evidence of a substantial nature which tended to show any negligence

on the part of appellants proximately causing appellee's injuries.

The evidence showed that the tracks of the railroad ran east and west through the town of Muldrow, and that Main street ran north and south. Appellee was in his automobile on the north side of the track and had started on a business errand to a point on the south side of the track. He testified that he was driving the automobile at about 15 miles per hour, and when he reached a rough place in the street, about 30 feet north of the railroad crossing, he slowed down and looked and listened for a train. He first looked to the west as far as he could see, to the section house, and did not see or hear a train, and then looked back east, shifted gears and started across the tracks, looking to the left, or east, for the reason that the depot was on the north side of the track and east of the crossing, and obstructed his vision to the east.

He continued to look to the east until he was practically on the track, and then looked forward, and about that time, when he had almost finished crossing the track, he heard a whistle and his automobile was struck by a freight train coming from the west, resulting in the collision and serious injuries to him.

He further testified that the section house, which was located about 450 feet west of the Main street crossing facing the railroad, and the trees in front of it obstructed his vision in that direction, and that one had to be practically on the track before he could see any further than the section house. The first warning he had that there was a train from the west was when the whistle blew at a time when the train was so close he could not get off the track in time to avoid being struck, at which time the train was about the same distance from him as the length of the court room. The whistle was not sounded nor the bell rung before. His hearing was not deficient before the collision, and he was in good health and 34 years of age and making from $72 to $80 per week as a carpenter.

Barto McConnell testified that he was on Main street, about 60 feet north of the crossing, at the time of

the collision. Just before the car got to the crossing there is a rough place and the car slowed up, practically stopped, and the driver apparently threw the car into second gear and eased onto the crossing, and by that time he discovered the train. It looked like the car was about half way across the track when the train struck it. Witness heard no signal or noise indicating the approach of the train until the train whistled about the time it struck the automobile. It did not whistle or sound its bell before that time, and if the whistle were blown or the bell rung about a quarter of a mile from the crossing he did not hear it. The street where the collision occurred was the main street of Muldrow and there were business houses on both sides of the track, and there is a section house and a tool house and some trees in the yard west of the crossing which might obstruct the vision of one approaching the crossing from the north.

Bill Jones testified that he was about 100 yards southeast of the crossing at the time of the collision; that in his best judgment the whistle was not blown or the bell rung.

Alex Vaughan testified that he was at his home, about a mile north of Muldrow, on this occasion, and saw the train proceeding east in the direction of the Main street crossing, but did not see the collision. He went in the house when the train was near the crossing in question, but he watched the train from the time it crossed a trestle until shortly before it entered the Main street crossing. "Q. How great a distance had the train traveled from the trestle until it got to the crossing where the accident happened? A. Approximately a mile. Q. Did it ever blow that whistle in that mile? A. Not until after it passed the section house, I know. Q. Was it ringing the bell during any of that time? A. Not that I know of, it was too far away for that, of course, but I know it did not blow the whistle."

Morgan Newman, a justice of the peace, testified that at the time of the collision he was one block south of the crossing on Main street, and that he did not hear the train whistle or the bell ring before the crash; that

west of the Main street crossing within the city limits there are two more railroad crossings, and he did not hear the whistle nor the bell sound for any of these crossings. The section house was about a block west of the Main street crossing, and the vision of one approaching the crossing from the north is obstructed by the section house, trees and tool house until he gets on the railroad.

Riley Vaughan testified that he was about 75 yards from the railroad, behind Blackard's store, at the time of the collision. He did not hear the train whistle until about the time it struck the car, and he did not hear the bell ring. He further testified that the section house, tool house and trees were an obstruction to one's vision looking west in approaching the crossing from the north.

W. T. Wilson testified that at the time of the collision he was standing about 150 feet south of the crossing. He did not hear the whistle blow nor the bell ring before the collision. He has looked west from a point just north of the crossing, and on the north side of the railroad there is a section house with trees in front of it and a tool house west of the section house. The trees had some leaves on them at the time, and were between the section house and the track.

Houston Brashfield testified that at the time of the collision he was in front of Blackard's store, about 100 feet away, and saw the train strike the car. He did not hear the train whistle nor the bell ring, and would have heard it if it had whistled.

Buddy Plank testified that on this occasion he was at the trestle about one-half mile west of Muldrow fishing, and heard and saw the train in question. If the whistle was blown or the bell rung between the time it passed him and got into town he did not hear it, and knows it would have attracted his attention, and could not have whistled without his hearing it. "Q. Do you mean to say it could not have whistled without you hearing it? A. Yes, sir. Q. Were you watching it? A. Yes, sir, for a good ways."

Both the engineer and fireman testified that the regular crossing whistle was given, and that the bell was

rung as they approached the Main street crossing, and that the train was making about 45 miles per hour. The train consisted of the engine, tender and 47 cars. The track was a little up-grade coming from the west. There were two crossings west of the Main street crossing, and when the train approached them the whistle was blown.

The fireman testified that as they passed the section house, about 450 feet west of the Main street crossing, he saw the car approaching the crossing at a low rate of speed, and he thought it was going to stop, as it slowed down 25 or 30 feet from the crossing. Then it moved on toward the crossing, and when they were about 150 feet from the crossing he told the engineer they were about to strike a car. The engineer immediately applied the brakes in emergency, but they were unable to avoid striking the car. The bell was ringing all the way through the town until the train stopped, and the engineer was blowing the whistle for the Main street crossing when he told him they were about to strike a car. The engineer did not undertake to slow the train until he told him about the car, 150 feet from the crossing. "Q. Why hadn't you seen him before you got by the section house? A. Well, I suppose maybe the section house may have had something to do with my not seeing him before then, and maybe I wasn't looking at that particular place. . . . I did not see him until we got by the section house. Q. The tool house is also on west of the section house? A. Yes, sir. Q. Both on the right-of-way? A. Yes, sir."

The engineer testified that the bell was ringing during this time and that he whistled at all of the crossings, including the Main street crossing. When the engine was about 150 feet from the crossing the fireman told him an automobile was coming onto the crossing, and he began a long whistle until the engine occupied the crossing, and he grabbed the brakes, pushed in the emergency and turned on the sand. The train stopped 22 car lengths from the crossing. He undertook to stop as quickly as he could and could not materially reduce the speed before reaching the crossing.

The conductor and a brakeman on the train testified that the standard crossing whistle had been sounded for

this crossing, and the brakeman said the bell was ringing and had been since the other side of Muldrow.

Other witnesses testified on behalf of appellants, some of whom testified that the whistle was blown for a considerable distance before the train entered the Main street crossing, others that they only heard the train whistle when it was near the section house. or between the section house and the Main street crossing, and still others did not remember whether the whistle was sounded before, at the time of or after the collision.

Pictures of the scene of the accident were taken three or four days thereafter and were introduced in evidence. These pictures show the section house and trees on the right-of-way west of the Main street crossing. It is conceded that the section house and trees are about 450 feet west of this crossing, and that the tool house is west of the section house and somewhat nearer the track. It is also conceded that the train was traveling at approximately 45 miles per hour or at a rate of 66 feet a second, and at that rate of speed it would have required only 7 seconds for the train to cover the distance between the section house and the crossing in question.

The collision in question occurred in the state of Oklahoma, and the test of liability depends upon the laws of that state. *Texas & Pacific Ry. Co.* v. *Stephens*, 192 Ark. 115, 90 S. W. 2d 978; *St. Louis, Iron Mountain & So. Ry. Co.* v. *Hesterly*, 98 Ark. 240, 135 S. W. 874.

Section 11961 of the Oklahoma statutes of 1931 provides: "A bell of at least 30 pounds weight, or a steam whistle, shall be placed on each locomotive engine and shall be rung or whistled at the distance of at least 80 rods from the place where the said railroad shall cross any other road or street."

In the case of *M. K. T. Railway Co.* v. *Stanton*, 78 Okla. 167, 189 Pac. 753, the court said: "The statute which requires a railroad company to give certain signals at highway crossings was not intended to furnish a standard by which to determine in every case whether or not such company had failed to discharge its duty in

respect to giving sufficient warning to the traveling public of the approach of its trains. It was intended rather to prescribe a minimum of care which must be observed in all cases.''

In support of appellants' contention that there was no negligence on their part, and that appellee's injuries were brought about solely by his own negligence, which proximately caused the collision and resulting injuries, and that for this reason they were entitled to a directed verdict, they cite the case of *M. K. T. Ry. Co.* v. *Flowers*, 187 Okla. 158, 101 Pac. 2d 816. We have carefully considered the Flowers case, and it is clearly distinguishable in facts from the instant case.

In *St. Louis, Iron Mountain & So. Ry. Co.* v. *Hitt,* 76 Ark. 227, 88 S. W. 908, this court quoted with approval from the case of *Richmond & D. Rd. Co.* v. *Powers,* 149 U. S. 43, 13 S. Ct. 748, 37 L. Ed. 642, as follows: ''It is well settled that, where there is uncertainty as to the existence of either negligence or contributory negligence, the question is not one of law, but of fact, and to be settled by a jury; and this whether the uncertainty arises from a conflict in the testimony, or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them.''

The court withdrew from consideration of the jury the question of keeping a lookout, and also the question of discovered peril. The evidence as to whether the signals required by the Oklahoma law were given in this case was squarely in conflict, and we think there was substantial evidence which warranted the court in submitting to the jury this question, and also the questions of the speed of the train and the alleged negligence of appellee, and the court's refusal to direct a verdict did not constitute reversible error. See *St. Louis, Iron Mountain & So. Ry. Co.* v. *Kimbrell,* 117 Ark. 457, 174 S. W. 1183, also *St. Louis-San Francisco Ry. Co.* v. *Whitfield,* 155 Ark. 560, 254 S. W. 323, which involved a railroad crossing collision in Oklahoma.

In *Safeway Stores, Inc.,* v. *Moseley,* 192 Ark. 1059, 95 S. W. 2d 1136, this court said: ''We find it neces-

sary to consider only the question raised by the appellant for an instructed verdict. In viewing the evidence adduced, we must give to it its highest probative value in favor of the appellee and indulge every inference reasonably deducible from the testimony to support the finding of the jury."

It is a well established rule that this court will not pass upon the weight of the evidence, this being the exclusive province of the jury, whose verdict should be upheld when it is based upon substantial evidence. *Lewis v. Shackelford,* 203 Ark. 500, 157 S. W. 2d 509.

Appellants next complain of errors in the giving and refusing of instructions. A careful examination of the instructions in question reveals no reversible error on the part of the court.

Appellants also contend that the court erred in refusing to sustain appellants' challenge to four jurors who admitted they had served as jurors in that court within the preceding two years, the ground for this challenge being that such jury service was prohibited by Act 135 of 1931, and that this act was not effectively repealed by Initiated Act No. 3 of 1936. We are unable to agree with this contention. We have heretofore upheld the validity of Initiated Act No. 3 (Acts 1937, p. 1384). *Penton v. State,* 194 Ark. 503, 109 S. W. 2d 131.

Appellants finally contend that the verdict of $15,000 is clearly excessive.

The evidence shows that after his injury appellee was confined in a hospital for a period of four weeks. He was intermittently conscious and unconscious for a week or ten days. After he returned home he was confined in bed for two weeks before he sat up, and after this he was "up and down" for four or five weeks. His injuries consisted of laceration on the back of his head, stitches being used to close the wound, a fractured collar-bone, a fracture without displacement of the transverse processes of the second and third lumbar vertebrae, and six fractured ribs. In addition to these injuries, Dr. Ben Pride, who treated him, testified that he has a knot on the left shoulder where the collar-bone was fractured,

and this shoulder is one and a half or two inches higher than the right shoulder, and an operation would be required to correct this condition, but this condition would not have a disabling effect on him to any great extent. He testified there were other injuries, and appellee suffered great pain, complaining of pain in the abdominal region and other places, and in his opinion he also received internal injuries; that at the time of the trial appellee appeared to be in good physical condition; that a fracture of the transverse processes is not considered serious unless there is displacement, and there was no displacement in this case.

Appellee testified that his injuries caused him to suffer great pain, and that he was not able to work by reason of his injuries until the latter part of September, 1941, being approximately six months that he did not work; that his senses of hearing and sight have been injured, and he continues to suffer pain and at times is dizzy and suffers lapse of memory. Prior to his injuries he was a carpenter, earning $1.125 an hour. He was given a job as a carpenter at Camp Chaffee in September, and was paid $1.125 an hour, the same pay that he received before the injury. He has continued to work at Camp Chaffee, doing regular carpenter work, and his foreman on this job and another man who worked with him testified that they did not observe anything wrong with him, and that he made no complaint to them about having sustained any injuries, or that he was unable to do the work assigned to him, and he was still so employed at the time of the trial.

When appellee went to work as a carpenter at Camp Chaffee after the accident, he was examined by Dr. E. J. Morrow, in a routine examination. Dr. Morrow testified that his examination disclosed nothing out of the ordinary in appellee's physical condition at that time. He examined his eyes, ears, nose, throat, heart, lungs, and for hernia and former injuries and deformities. He stripped him to make the examination, and found no abnormalities of a noticeable type, and passed him.

It is undisputed that appellant lost about six months time due to his injuries, and that hospital and doctor

bills amounted to almost $600. When he resumed work he did about the same type of work as a carpenter that he had been doing before his injury and drew the same pay therefor. There is no evidence that his earning capacity has been materially, if at all, reduced.

Placing the most liberal construction upon the evidence of which it is susceptible, it does not sustain a judgment for more than $7,500. Therefore, if appellee will enter a remittitur within fifteen days for the sum of $7,500 the judgment will be modified and affirmed; otherwise it will be reversed and the cause remanded for a new trial.